**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **Criminal No. 1:25-cr-00191-EGS** |
| **v.** | |
| **SETH JASON,** | **Sentencing Date:  June 18, 2026** |
| **Defendant.** | |

## GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

On at least eight occasions over a fifteen month period, the Defendant, Seth Jason ("the Defendant"), used phones from his Government, taxpayer funded, job at the Voice of America to call two local district offices of Marjorie Taylor Greene (then-U.S. Representative for Georgia's 14th Congressional District), to threaten and terrify the Congresswoman, her staff, and their families with gun violence and death in eight bone-chilling voicemails.

The content of the Defendant's calls was chilling. The Defendant repeatedly made explicit threats with graphic depictions, for example, declaring during the first voicemail on October 11, 2023, that he and his friends "*have our **AK-47s** and we alls want to take them out on her because that's what we need. **One between the th- th- the eyes.***" Other calls over the ensuing months include similarly alarming threats directed at Representative Greene and her staff, such as "***We are going to let you see what fear is like***" and, in a call on January 8, 2025, "***Greene you will not see the inaugural, you'll be dead. Your family will be dead. Your staff will be dead***." In a particularly disturbing finale, on January 21, 2025 (one day after the Presidential Inauguration), the Defendant left a voicemail stating:

> *You're as good as dead. **You, your staff are as good as dead**. Make your last will ready, because we are coming after you, and the only thing you're going to hear is bang, bang, bang, dead, dead. I can't wait. **I'm yearning to hear you cry for your***

*last breath. [Inaudible] to hear you cry for your last breath.* **We're going to kill you and your staff and staff's family***.*

The Defendant's terrifying threats were not spontaneous or impulsive. Rather, they were part of a deliberate and sustained campaign to intimidate and disrupt the Congresswoman's congressional duties, as well as to instill fear into the personal lives of her staff and family members. Because they were anonymized, those being threatened had no idea whether they could leave the office, go to a grocery store, or take their kids to soccer practice without being ambushed by a crazed gunman seeking to kill them and their families.

These threats on a public official, as well as her staff and families, are vicious on their face. However, the Defendant's conduct is even more disgraceful given the fact that the Defendant, a seemingly ordinary U.S. citizen and college graduate, used his government job at a public broadcasting network, funded by the U.S. taxpayers, to conceal his identity and instill extreme fear in multiple victims. By leveraging his position in this manner, the Defendant not only facilitated his criminal conduct but also deliberately hindered law enforcement's ability to track and identify him. This calculated misuse of government resources underscores both the sophistication of his conduct and his willingness to abuse a position of trust to carry out repeated threats of violence.

Against the backdrop of a well-documented rise in political violence and an alarming increase in threats directed at Members of Congress, the Defendant's actions demand a serious sentence of imprisonment from the Court. As outlined below, based on the 3553(a) factors, the United States requests a sentence of 30 months' imprisonment, at the top of the applicable Sentencing Guidelines range. Such a sentence is necessary to reflect the seriousness of the offense, promote respect for the law, provide just punishment, and deter both this Defendant and others from engaging in similar conduct. Anything less would fail to adequately account for the calculated

nature of the Defendant's actions, his abuse of federal resources, and the broader threat such conduct poses to public officials who serve our country and their families.

## BACKGROUND

*The Offense Conduct*

The Presentence Investigation Report (PSIR) summarizes the relevant offense conduct. *See* PSIR ¶¶ 9-19.

The Defendant was employed at Voice of America (VOA) from 2001 to 2025. *Id.* at ¶¶ 10 and 66. Voice of America is a component of the federal government. VOA was founded in 1942 "to broadcast information in Europe during World War II." *Id.* at 9. Since its founding, VOA grew into an agency that, at the time of the offense, employed a workforce of over 2,000 employees and broadcasted information in dozens of languages across the world. *Id.*

The VOA headquarters is located in Washington, D.C., and houses "ten broadcast TV studios, 32 video editing studios, 21 radio broadcasting studios, 21 radio production and recording studios, and 26 audio mixing and dubbing stations." *Id.* at ¶ 9.

The Defendant most recently worked at VOA as a Studio Supervisor and Lighting Director. *Id.* at ¶ 10. His position gave him access to the dozens of studios at VOA headquarters, which he exploited to facilitate the instant offense. *See id.* at ¶¶ 10-11. The Defendant would use the telephones in vacant control rooms in various broadcasting studios to call the district offices of Representative Greene and leave threatening voicemails. *See id.* at ¶ 11.

On October 11, 2023, the Defendant placed a call using a phone line at VOA headquarters to the Dalton, Georgia District Office for Representative Marjorie Taylor Greene. The call proceeded to voicemail. The Defendant left a voicemail stating, "*My friends would like to go to a Greene rally because we have our **AK-47s** and we alls want to take them out on her because that's*

3

*what we need.* **One between the th- th- the eyes**." *Id.* at ¶ 12 (emphasis added).

Only two days later, on October 13, 2023, at 12:03 PM, the Defendant placed a call using a phone line at VOA headquarters to the Dalton, Georgia District Office for Representative Greene. The call proceeded to voicemail. The Defendant left a voicemail stating, "*This is Kevin and my friends and I have followed her great advice about stocking up and* **stockpiling ammo**. *We have done that. And our next step is to come after Greene and her offices and her staff and exercise our Second Amendment rights and* **take them all out**." *Id.* at ¶ 13 (emphasis added).

On November 20, 2023, at 1:31 PM, the Defendant placed a call using a phone line at VOA headquarters to the Dalton, Georgia District Office for Representative Greene. The call proceeded to voicemail. The Defendant left a voicemail stating, "*Hey, this is Kevin and we are looking forward to your book signing on December 2nd. Myself and my family are (unintelligible)* **well armed**. *And we're gonna take good care of you and your staff and make America better*. **Bam, bam**." *Id.* at ¶ 14 (emphasis added).

On January 26, 2024, at 2:59 PM, the Defendant placed a call using a phone line at VOA headquarters to the Dalton, Georgia District Office for Representative Greene. The call proceeded to voicemail. The Defendant left a voicemail stating, "**We are coming after you, your families, your staff families and we are locked and loaded. We are going to let you see what fear is like. We're going to take you all out**." *Id.* at ¶ 15 (emphasis added).

On March 12, 2024, at 1:30 PM, the Defendant placed a call using a phone line at VOA headquarters to the Rome, Georgia District Office for Representative Greene. The call proceeded to voicemail. The Defendant left a voicemail stating, "*Hi. My name is Ruben, and I just want to let the Greene people know me and my team, we are* **locked and loaded** *and we're* **coming after you and your staff and your families with all of our weapons**, *we are going to express how mad*

4

*we are at Greene and her team of racist Nazi followers, bam, bam.*" *Id.* at ¶ 16 (emphasis added).

On April 19, 2024, at 1:06 PM, the Defendant placed a call using a phone line at VOA headquarters to the Dalton, Georgia District Office for Representative Greene. The call proceeded to voicemail. The Defendant left a voicemail stating, "*We are coming after you, we are coming after your family, we are coming after your staff, we are coming after your staff's family. We are locked and loaded and **we are takin you out you Nazi**, you're antisemitic Nazi, and **you all are going to pay the price**.*" *Id.* at ¶ 17 (emphasis added).

On January 8, 2025, at 12:42 PM, the Defendant placed a call using a phone line at VOA headquarters to the Dalton, Georgia District Office for Representative Greene. The call proceeded to voicemail. The Defendant left a voicemail stating, "***Greene you will not see the inaugural, you'll be dead. Your family will be dead. Your staff will be dead***. *On the 20th, you'll all be dead. This will be the beginning of the revolt against you, **you racist cunt***." *Id.* at ¶ 18 (emphasis added).

On January 21, 2025, at 11:35 AM, the Defendant placed a call using a phone line at VOA headquarters to the Dalton, Georgia District Office for Representative Greene. The call proceeded to voicemail. The Defendant left a voicemail stating, "*You're as good as dead. You, your staff are as good as dead. **Make your last will ready***, *because we are coming after you, and the only thing you're going to hear is bang, bang, bang, dead, dead. **I can't wait. I'm yearning to hear you cry for your last breath***. *(Inaudible) to hear you cry for your last breath. **We're going to kill you and your staff and staff's family***." *Id.* at ¶ 19 (emphasis added).

Law enforcement determined that each of the calls were made from various control rooms for broadcasting studios at the VOA headquarters building. The calls were made at times that the broadcasting studios were not booked or were in "set up time" for an upcoming show.

5

*Interview with Law Enforcement*

On July 1, 2025, the Defendant was interviewed by law enforcement. During that interview, he was asked if he placed calls to Representative Greene. The Defendant told law enforcement that he "may" have made one or two calls in approximately 2022 to Representative Greene's office in Washington, D.C. but denied making any threats during the calls. After hearing an audio recording of the voicemail from October 11, 2023, the Defendant acknowledged that it was his voice on the call, but claimed he did not remember making the call. Law enforcement then played a recording of the voicemail from January 21, 2025, and again the Defendant indicated that he did not remember making the call. The Defendant then asked law enforcement not to play any more recordings.

*Procedural History*

The Defendant was indicted on July 9, 2025, by a federal grand jury on four counts: Influencing a Federal Official by Threatening a Family Member, in violation of 18 U.S.C. § 115(a)(1)(A) (Count One); Influencing a Federal Official by Threat, in violation of 18 U.S.C. § 115(a)(1)(B) (Count Two); Interstate Communications with a Threat to Kidnap or Injure, in violation of 18 U.S.C. § 875(c) (Count Three); and Anonymous Telecommunications Harassment, in violation of 47 U.S.C. § 223(a)(1)(C) (Count Four).

On December 18, 2025, the Defendant pleaded guilty to Counts Three and Four of the Indictment pursuant to a plea agreement. *See* ECF No. 27. As part of the plea agreement, the Government agreed to dismiss the remaining counts of the Indictment at the time of sentencing. *Id.* at 2. The parties also agreed to the applicable analysis of the Sentencing Guidelines. *Id.* at 2-5. Under the plea agreement, the parties agreed that a sentence within their Estimated Guidelines Range of 24 to 30 months would be reasonable in light of all of the factors set forth in 18 U.S.C.

§ 3553(a). *See id.* at 5. Both parties agreed to reserve allocation. *See id.* at 5-6.

## VICTIM IMPACT STATEMENT

The victim has provided the Government with a victim impact statement, which is attached hereto as **Exhibit A**.

## APPLICABLE LAW

Although the Sentencing Guidelines are advisory, under *United States v. Booker*, a sentencing court "must consult those Guidelines and take them into account when sentencing." 543 U.S. 220, 264 (2005); *United States v. Brown*, 892 F.3d 385, 399 (D.C. Cir. 2018). The Supreme Court has noted that while the Guidelines provide "the starting point and the initial benchmark" for sentencing, the district court should consider all the § 3553(a) factors. *Gall v. United States*, 552 U.S. 38, 49–50 (2007). The Guidelines' recommended sentencing range will ordinarily "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Kimbrough v. United States*, 552 U.S. 85, 108–09 (2007).

The listed factors in 18 U.S.C. § 3553(a) include the following:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed –
> > (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> > (B) to afford adequate deterrence to criminal conduct;
> > (C) to protect the public from further crimes of the defendant; and
> > (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and the sentencing range established for –
> > (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines –
> > > (i) issued by the Sentencing Commission . . .; and

(ii) that, . . . are in effect on the date the defendant is sentenced; . . .

(5) any pertinent policy statement –
  (A) issued by the Sentencing Commission . . . and
  (B) that, . . . is in effect on the date the defendant is sentenced.

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

But the Sentencing Guidelines are only "the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). They "are not the only consideration." *Id.* A sentencing judge "should . . . consider all of the § 3553(a) factors," and "[i]n so doing, . . . may not presume that the Guidelines range is reasonable." *Id.* at 50. "[I]t is not error for a district court to enter sentencing variances based on factors already taken into account by the Advisory Guidelines, in cases in which the Guidelines do not fully account for those factors, or when a district court applies broader § 3553(a) considerations in granting the variance." *United States v. Ransom*, 756 F.3d 770, 775 (D.C. Cir. 2014) (citation and internal quotation marks omitted). In doing so, "the district court can rely on hearsay as evidence for its findings." *United States v. Miller*, 35 F.4th 807, 818 (D.C. Cir. 2022). *See also United States v. Jones*, 744 F.3d 1362, 1368 (D.C. Cir. 2014) ("Clear precedent permits hearsay to be used in sentencing decisions."). And the sentencing court can consider conduct by a defendant that was not charged or even for which a defendant was acquitted. *See United States v. Settles*, 530 F.3d 920, 923 (D.C. Cir. 2008) ("[L]ong-standing precedents of the Supreme Court and this Court establish that a sentencing judge may consider uncharged or even acquitted conduct in calculating an appropriate sentence, so long as that conduct has been proven by a preponderance of the evidence and the sentence does not exceed the statutory maximum for the crime of conviction.").

8

**THE APPLICABLE SENTENCING GUIDELINES**

The parties and the United States Probation Office agree on the Sentencing Guidelines calculations for Count Three, which estimate the Defendant's total offense level to be 17 and his criminal history to be category I, yielding a Guidelines imprisonment range of 24 to 30 months. PSIR at ¶ 80; *see also* Plea Agreement (ECF No. 27) at 2-5.

Count Three is governed by U.S.S.G. § 2A6.1, which applies to "Threatening or Harassing Communications; Hoaxes; False Liens." Pursuant U.S.S.G. § 2A6.1(a)(1), the Base Offense Level is 12. In addition, there is a two-level increase *because the offense involved more than two threats*. *See* U.S.S.G. § 2A6.1(b)(2) (emphasis added). There is an additional six level increase applicable *because the victim was a government officer or employee*, the offense was motivated by such status, and "the applicable Chapter Two guideline is from Chapter Two, Part A (Offenses Against the Person)." *See* U.S.S.G. § 3A1.2(b) (emphasis added). The Defendant is not entitled to a Zero-Point Offender adjustment because the specific offense characteristics here involve "credible threats of violence." *See* U.S.S.G. § 4C1.1(3).

Count Four is also governed by U.S.S.G. § 2A6.1. However, pursuant to U.S.S.G. § 2A6.1(a)(2), the Base Offense Level is 6, because the Defendant was convicted of an offense under 47 U.S.C. § 223(a)(1)(C). There is a two-level increase because the offense *involved more than two threats*. *See* U.S.S.G. § 2A6.1(b)(2) (emphasis added). There is an additional six level increase applicable *because the victim was a government officer or employee*, the offense was motivated by such status, and "the applicable Chapter Two guideline is from Chapter Two, Part A (Offenses Against the Person)." *See* U.S.S.G. § 3A1.2(b) (emphasis added). The Defendant is not entitled to a Zero-Point Offender adjustment because the specific offense characteristics here involve "*credible threats of violence*." *See* U.S.S.G. § 4C1.1(3) (emphasis added).

Counts Three and Four are grouped together into a single Group pursuant to U.S.S.G. § 3D1.2(b), because they involved substantially the same harm and involved the same victim and two or more acts or transactions connected by a common criminal objective or constituted part of a common scheme or plan. *Cf.* U.S.S.G. § 2A6.1, Comment 3 ("multiple counts involving making a threatening or harassing communication to the same victim are grouped together under §3D1.2 (Groups of Closely Related Counts)").

Under U.S.S.G. § 3D1.3(a), the offense level for the Group of Count Three and Count Four is 20, the highest offense level of the counts in the Group. Accordingly, the total Guidelines imprisonment range, which is agreed to by U.S. Probation and the parties, is 24 to 30 months incarceration. PSIR at ¶ 80.

Additionally, the PSIR reflects a Guidelines range of not more than 3 years supervised release as to Count Three. *Id.* at ¶ 87. With regard to Count Four, the PSIR estimates a Guidelines range of not more than one year of supervised release, pursuant to U.S.S.G. § 5D1.2(a)(3). *Id.* at ¶ 88. The PSIR indicates that the terms of supervised release should run concurrently. *Id.* at ¶ 86 (citing 18 U.S.C. § 3624(e)).

## THE GOVERNMENT'S SENTENCING RECOMMENDATION

The Government requests that the Court sentence the Defendant on Count Three to 30 months of imprisonment, followed by 3 years of supervised release, and on Count Four to 24 months of imprisonment, followed by 1 year of supervised release, with the sentences on the two counts run concurrently.[1] A sentence at the top of the Guidelines range is necessary to reflect the nature of these offenses and provide adequate deterrence to others in the community, particularly

---

[1] The Guidelines applicable here state that "the sentences on all counts shall run concurrently, except to the extent otherwise required by law." *See* U.S.S.G § 5G1.2(c).

given the fear and disruption caused by the overwhelming amount of threats received by government officials generally, and Members of Congress in particular. A top of the Guidelines sentence is appropriate given the egregiousness of the Defendant's conduct – a college graduate abusing his access at a government-funded job over the course of more than a year to repeatedly make anonymous and terrifying threats to kill a sitting Congresswomen, her staff, and their families.

I.      **The Nature and Circumstances of the Defendant's Offenses.**

The nature and circumstances of the Defendant's offenses warrant a sentence of imprisonment at the top end of the Guidelines, 30 months. The Defendant engaged in a lengthy and persistent campaign aimed at frightening and intimidating Representative Greene by continually threatening the Congresswoman, the Congresswoman's family, the Congresswoman's staff, and the innocent family members of the Congresswoman's staff. The Defendant repeatedly left threatening and terrifying voicemails throughout a period of over fifteen months. He left at least eight threatening voicemails, giving him seven separate opportunities to reflect on his most recent contact and decide against further criminal conduct. Instead of having any remorse, the Defendant continued calling Representative Greene's offices and instilling fear.

The content and tone of the threats here are particularly egregious and are laid out in specific and disturbing detail. The Defendant continually made explicit threats involving shooting and murdering the Congressman, her staff, and her family, including using AK-47s, stockpiling ammunition, shooting the Congresswoman "between the eyes", and openly fantasized about "yearning to hear [the Congresswoman] cry[ing] for her last breath."

Further exacerbating the seriousness of the offense, the Defendant often mentioned specific upcoming dates in relation to his threats. For example, he threatened to kill the Congresswoman

11

at a Greene rally, then at or before the inauguration, and then at a public book signing. These specific details were designed to heighten the fear by the recipients that the Defendant intended to carry through on his threats and to cause chaos and distress at forthcoming public events. Most gallingly, the Defendant did not constrain himself to threatening the apparent focus of his ire, but instead compounded the fear caused by his calls by also threatening the Congresswoman's family, the staff of the Congresswoman, and the staff's families. As just one example, on January 21, 2025, the Defendant ended his call by saying "*We're going to kill you and your staff and staff's family.*"

The fact that the Defendant decided to call the Congresswoman's local district offices in Rome and Dalton, Georgia, instead of her offices at the Capitol, also exacerbate the nature and circumstances of the offense. Because the threats were received by employees in smaller and more remote locations, outside of the protection of the U.S. Capitol complex, they would naturally cause even more fear and insecurity.

The Defendant's actions demonstrate that he consciously planned each call by seeking out a phone in the control room of a vacant studio at the offices of his federal employer, rather than calling from his own office or his personal phone. These efforts frustrated the ability of law enforcement to identify the caller and assess the risk as to whether the Defendant intended to carry out his threats. Therefore, the recipients of the Defendant's threats were left to guess about the danger and wonder – month after month – who the threatening caller was and whether he would attempt to follow through on his repeated threats to shoot and kill the Congresswoman, her family, her staff, and her staff's families. Former Congresswoman Greene has specifically written to the Court, and personally described the impact of these extreme death threats and harassment on herself, her family, and her former staff, as well as the fear she experience that he would act on his threats and fantasies. *See* Exhibit A.

The nature and circumstances of the threats in this case could not be more serious. Indeed, threats of death or physical violence have a grave effect on their recipients, causing fear, disruption, and serious emotional distress among victims. *See Counterman v. Colorado*, 600 U.S. 66, 74 (2023) ("When the statement is understood as a true threat, all the harms that have long made threats unprotected naturally follow. True threats subject individuals to 'fear of violence' and to the many kinds of 'disruption that fear engenders.'") (citing *Virginia v. Black*, 538 U.S. 343, 360 (2003), 538 U.S. at 360). The fact that the Defendant may not have planned to carry out his threats is not mitigating to the offenses here.  As noted in this district, speakers need not actually intend to carry out the threat to make it a criminal action. *United States v. Syring*, 522 F. Supp. 2d 125, 129 (D.D.C. 2007) ("The prohibition on true threats protects individuals from the fear of violence and from the disruption that fear engenders, in addition to protecting people from the possibility that the threatened violence will occur." (citing *Virginia v. Black*, 538 U.S. 358, 360 (2003)). When a person is threatened and their safety is challenged, the harm is complete. Moreover, in this instance, the Defendant has acknowledged in the plea agreement that these threats were credible. *See* ECF No. 27 at 4.

Given the recent rise in political violence, threats against public officials must be taken seriously. Shortly before the Defendant's threatening communications, the then-Chief of the U.S. Capitol Police, J. Thomas Manger, testified before Congress and warned of the strain on the personnel and resources of the Department resulting from the increase in threats:

> The sheer increase in the number of threats against Members of Congress—approximately **400% over the past 6 years**—requires new and innovative techniques to identify, deter, and mitigate threats before they materialize. Over the course of the last year, the world has continuously changed, becoming more violent and uncertain. **A Member of Congress was brutally assaulted, another Member was attacked on the campaign trail, and the husband of the former House**

**Speaker was critically wounded in a politically-motivated attack**.[2]

The situation has not improved much since, as the current Chief of the U.S. Capitol Police

Michael G. Sullivan explained at a more recent hearing before Congress:

> Threats against Members continue to increase at an alarming rate. In 2025, the Department investigated nearly 15,000 concerning statements, behaviors, and communications directed against the Congressional community – this is **a 58 percent increase from 2024, and for which we are on pace to exceed in 2026**.[3]

The fear created in those threatened and the seriousness of the offense must be understood

in the context of an increased risk of violence and threats against public officials, including in all

branches of government and at the local and federal level. *See e.g.*, Ashley Parker, ***Shooting at***

***Trump rally*** *upends presidential campaign*, THE WASHINGTON POST (Jul. 14 2024),

https://www.washingtonpost.com/politics/2024/07/13/trump-shooting-campaign-politics/;

Jeremy Roebuck, et al., ***Trump ally Charlie Kirk gunned down*** *in brazen act of political violence*,

THE WASHINGTON POST (Sept. 11, 2025), https://www.washingtonpost.com/national-

security/2025/09/10/kirk-shooting-political-violence/; Rachel Pannett & María Luisa Paúl, *What*

*to know about the possible **assassination attempt at Trump's golf course***, THE WASHINGTON POST

(Sept. 16, 2024), https://www.washingtonpost.com/politics/2024/09/16/trump-golf-assassination-

attempt-what-to-know/; Jada Yuan and Kadia Goba, *Utah police arrest man accused of **assaulting***

---

[2] Oversight of the United States Capitol Police: Hearing before U.S. House of Rep. Comm. on House Admin., 118th Cong. (Mar. 16, 2023) (Formal Statement of J. Thomas Manger Chief, U.S. Capitol Police). Available at https://www.congress.gov/118/meeting/house/115649/witnesses/HHRG-118-HA00-Wstate-MangerJ-20230516.pdf (last accessed March 19, 2026) (emphasis added).

[3] U.S. Capitol Police FY 2027 Budget Hearing: Hearing before U.S. House of Rep. Comm. on Appropriations, Subcomm. on Legis. Branch., 119th Cong. (Mar. 17, 2026) (Formal Statement of Michael G. Sullivan, Chief, U.S. Capitol Police). Available at https://docs.house.gov/meetings/AP/AP24/20260317/119052/HHRG-119-AP24-Wstate-SullivanM-20260317.pdf (last accessed March 19, 2026) (emphasis added).

*Rep. Maxwell Frost*, THE WASHINGTON POST (Jan. 25, 2026), https://www.washingtonpost.com/politics/2026/01/25/maxwell-frost-sundance-assault/; Maegan Vazquez, *Federal and local authorities charge man accused of **attack on Rep. Omar***, (Jan. 29, 2026), THE WASHINGTON POST https://www.washingtonpost.com/politics/2026/01/29/justice-department-charge-omar-attack/; Patrick Marley et al, ***Minn. lawmaker, husband killed in shooting**, setting off search for gunman*, THE WASHINGTON POST (Jun. 14, 2025), https://www.washingtonpost.com/nation/2025/06/14/minnesota-lawmakers-melissa-hortman-targeted-shooting/; Eugene Scott, *Assailant shouted 'Where is Nancy?' in break-in at speaker's home, **attack on Paul Pelosi***, THE WASHINGTON POST (Oct. 28, 2022), https://www.washingtonpost.com/politics/2022/10/28/paul-pelosi-attack-san-francisco/; ***Son of US District Judge Esther Salas was killed**, and her husband shot at New Jersey home, chief district judge says*, THE WASHINGTON POST (Jul 19, 2020), https://www.washingtonpost.com/national/son-of-us-district-judge-esther-salas-was-killed-and-her-husband-shot-at-new-jersey-home-chief-district-judge-says/2020/07/19/96dc552a-ca33-11ea-99b0-8426e26d203b_story.html; Andrew Jeong, ***Indiana judge and his wife injured in shooting** at their home, police say*, THE WASHINGTON POST (Jan. 20, 2026), https://www.washingtonpost.com/nation/2026/01/20/judge-steve-meyer-indiana/. Unfortunately, the political violence occurring in today's society is all too real, and public officials and their families are forced to take threats such as the Defendant's seriously.

In sum, the nature and circumstances of the Defendant's conduct clearly demonstrate his intent to instill fear and disrupt the office of an elected official, as well as her office's family members, during an era of extreme political violence. The severity and frequency of these threats, and the circumstances under which they were made, justifies a high-end sentence of 30 months'

15

incarceration.

## II.    The History and Characteristics of the Defendant.

The Defendant's personal history and characteristics also weigh in favor of a 30-month sentence. Indeed, nothing in the defendant's history provides an explanation or excuse for his criminal conduct. The Defendant is not a reckless youth who did not know any better. Rather, he is a 65-year-old college graduate who spent the last 25 years working as a federal employee for the VOA. The defendant is financially established and has led a good life without any mental health issues.  Simply put, he was a grown and mature man who should have known better and handled his grievances without violating the law.

The fact that the Defendant misused his position as a federal employee at VOA as a means of obscuring his identity and committing this crime is an aggravating factor. An established man with a stable government job chose to exploit his access to federal government resources to commit this crime, evade detection, and frustrate law enforcement efforts to stop him. This was not accidental or opportunistic – it was calculated. Instead, at VOA – an agency designed to use communications for the public good – the Defendant exploited his position to use the organization's equipment to communicate terrifying and disruptive threats to other public servants.

It is particularly troubling that, and quite ironic, that after more than twenty years of federal employment, the Defendant – who otherwise maintained a stable and ordinary life – repeatedly and deliberately chose to engage in conduct designated to disrupt and instill fear in the lives of other public servants simply because he disagreed with their views.

The Defendant should have been acutely aware of the effect such threats would have on his fellow federal employees merely trying to do their jobs *as well as their families* – both from his own employment and that of his own family, including his mother who worked at the National

16

Institute of Health and his sister who worked at the United States Department of Agriculture. *See id.* at ¶¶ 44-45. The Defendant was not acting under duress, instability, or exigent circumstances; rather he made a sustained and conscious decision to weaponize his access and anonymity to terrorize an elected official and her staff.

While the Defendant's employment position may not qualify for a formal enhancement under U.S.S.G. § 3B1.3, the Court should nonetheless give significant weight to his abuse of federal employment at sentencing. His conduct reflects a serious breach of the trust inherent in public service and underscores the need for a sentence that promotes respect for the law and deters similar abuses by others in position of access and responsibility.

Nor can the Defendant's actions be explained or mitigated by any mental health issue. The PSIR indicates that the Defendant does not appear to have received a mental health diagnosis. *Id.* Similarly, the Defendant did not report any history of substance abuse that could provide an explanation for his criminal behavior. *See id.* at ¶ 59. And while the Defendant has no prior criminal convictions (*id.* at ¶¶ 37-38), the Guidelines sentencing range already accounts for his low criminal history. In addition, the Guidelines explicitly exclude the Defendant from receiving the benefit of an adjustment for zero-point offenders because he used "credible threats of violence in connection with the offense." *See* U.S.S.G. § 4C1.1(a)(3).

Here, there is no basis for a downward variance from the established and agreed-upon sentencing Guidelines. On the contrary, the Defendant's personal history and characteristics in committing this crime weigh in favor of a sentence at the high-end of the Guidelines.

### III.   The Need for the Sentence Imposed.

The requested sentence is sufficient but not greater than necessary to meet the goals of sentencing. The sentence reflects the seriousness of the offense and also provides deterrence to

17

such criminal conduct. As noted above, political violence in this country continues to rise. Threats against public officials, including specifically against Members of Congress, are increasing sharply each year. Last year, the United States Capitol Police "investigated 14,938 concerning statements, behaviors, and communications directed against Members of Congress, their families, staff, and the Capitol Complex." USCP Threat Assessment Cases for 2025, (Jan. 27, 2026), https://www.uscp.gov/media-center/press-releases/uscp-threat-assessment-cases-2025. In 2024, there were only 9,474 such investigations. *Id.* It represents the third consecutive yearly increase threats investigations involving members of Congress. *See id.* As noted above, as the number of such threats increases, law enforcement is increasingly strained to assess them and provide appropriate protection to Members of Congress. The Government's requested sentence will signal to the community that repeated and serious threats against a public official are a grave matter and hopefully deter others from making such threats. It will also provide an opportunity for the Defendant to reflect on the serious nature of his crimes.

The Defendant's choice to repeatedly threaten violence and engage in a pervasive harassment campaign against a lawmaker in particular, demonstrates a lack of self-control and a lack of respect, not just for the individual lawmakers or victims of her offense, but for the rule of law more generally. Further, the Defendant's threats against staff members of an elected official are striking examples of disrespect and contempt toward legislative authority and require an appropriate sanction as punishment, not only to protect the public figures who run for election, but also for the private figures who are employees of the Legislative Branch. The Defendant's threats to kill staff *and their families* simply because they worked for a Member of Congress clearly demonstrate why a sentence at the high end of the Guidelines range is essential to promote respect for the law. Further, given that this was not an isolated incident, but that the Defendant here instead

18

persistently chose to make these threatening calls, time after time, a significant sentence is necessary to ensure that the Defendant does not return and engage in further threatening conduct.

In sum, a sentence at the top of the Guidelines range is reasonable, just, and necessary.

## **CONCLUSION**

For all the foregoing reasons, the Government respectfully requests that the Court impose a sentence on Count Three of 30 months of imprisonment, followed by 3 years of supervised release, and on Count Four to 24 months of imprisonment, followed by 1 year of supervised release, with the sentences on the two counts run concurrently.

Respectfully submitted,

Jeanine Ferris Pirro
United States Attorney

By:        */s/ Brendan M. Horan*
Brendan M. Horan
Special Assistant United States Attorney
N.Y. Bar No. 5302294
601 D Street NW
Washington, DC 20579
(202) 730-6871
Brendan.Horan@usdoj.gov

19