**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **Criminal No. 1:25-cr-00191-EGS** |
| **v.** | |
| **SETH JASON,** | **Sentencing Date: June 18, 2026** |
| **Defendant.** | |

## GOVERNMENT'S REPLY MEMORANDUM IN AID OF SENTENCING

The Defendant's opposition focuses largely on avoiding full accountability for his criminal conduct by shifting blame to the victim. The fact is that none of the points raised by the Defendant remotely justify his criminal behavior. The Defendant engaged in a lengthy campaign to terrorize a Congresswoman, her staff, and their families by repeatedly leaving anonymous voicemails with explicit and graphic death threats. The Defendant's motivations or justifications for his crimes is beside the point. As set forth in the Government's Memorandum in Aid of Sentencing (ECF No. 34), it is the nature and circumstances, the history and characteristics of the Defendant, seriousness of the offense, the need to promote respect for the law, the need to afford adequate deterrence, and the other statutory factors set forth in 18 U.S.C. § 3553(a) that support the Government's requested sentence of thirty months of incarceration.

## DISCUSSION

### I.    The Nature and Circumstances of the Defendant's Offenses

The Defendant wants to make this case all about the Representative's statements rather than his own. He simultaneously purports to accept responsibility for the conduct charged in Counts Three and Four, but in the same breath argues they were a justified expression of "outrage" to Congresswoman Greene's comments. In fact, Defendant invokes this "outrage" no less than

eight times in his sentencing memorandum. The Defendant's reliance on outrage at the Congresswoman is intended to obscure and misdirect the Court away from what should properly be assessed in determining an appropriate sentence: the nature and circumstances of the Defendant's own actions.[1] And no matter how offended the Defendant was, nothing justifies his criminal campaign of repeated death threats directed at the Congresswoman and all those associated with her. His efforts to argue otherwise undermine his acceptance of responsibility in this matter.

The nature of the offense is that the Defendant abused the access provided by his government job to repeatedly leave anonymous death threats with the office of a Member of Congress over a fifteen-month period. The Defendant continually made explicit threats involving shooting and murdering the Congresswoman, her staff, and her family, including using AK-47s, stockpiling ammunition, shooting the Congresswoman "between the eyes," and openly fantasized about "yearning to hear [the Congresswoman] cry[ing] for her last breath." Despite all of the letters attached to the Defendant's sentencing memorandum, such conduct is certainly not consistent with "a most peaceful and considerate" or "kind and gentle person." *See* Def. Memo at 3.

---

[1]    The Defendant's sentencing memorandum argues that it is "[i]t is noteworthy that the threats in this case make reference to the 'Jewish Space Laser' statements attributed to the victim. It is therefore clear that the motivation for the Defendant's threats were these purported outrageous antsemitic [sic] statements." *See* Def. Memo. at 2. Despite this assertion as he faces sentencing, the Defendant never once mentioned or referenced any statement about a "Jewish Space Laser" or antisemitism during his eight threatening voicemails over his fifteen-month campaign to intimidate and terrify the office of Representative Greene. *See* ECF No. 37-1. Indeed, while the Defendant couches his criminal conduct as an almost righteous response to the victim's social media posts from five years earlier, it is entirely unclear from the substance of the Defendant's numerous threats that they were at all calculated to address antisemitism. Nor did the Defendant's outrage and activism extend to any non-criminal means of advocating against antisemitism. *See* Def. Memo. Ex. A at 7 ("Mr. Jason noted that he . . . has never participated in any formal rallies, marches or other protests related to politics or antisemitism."). Instead, the Defendant's supposed outrage is an attempted excuse for his criminal campaign to harass and terrify an elected official with whom he disagreed.

The Defendant wants the Court to overlook that the Defendant's conduct involved multiple calls over a sustained fifteen-month period that does not correlate with the victim's comments. The Congresswoman's comments highlighted by the Defendant in his sentencing memorandum were posted on Facebook on November 17, 2018, two years before she was elected to Congress *and nearly five years before the Defendant's first threatening call*.[2]  They became widely publicized upon the start of her congressional term in January 2021.[3] Yet, the Defendant waited nearly *two years* after the Representative was elected to voice his alleged outrage about the comments by starting his campaign of anonymous intimidation. And he continued his campaign all the way until January 21, 2025, *seven years* after she posted the comments and *four years* after she was sworn in to Congress. The Defendant portrays his conduct as some sort of kneejerk reaction to a current event. There was nothing kneejerk about what he did. It was sustained and calculated. The Defendant's threats did not dissipate, but became increasingly graphic through January 2025. Moreover, the Defendant's threats related to or referenced political events or topics rather than antisemitism, such as when the Defendant threatened to kill the Congresswoman at a rally or a book signing, or again at or before the Presidential Inauguration.

In addition, while the Defendant attempts to justify his numerous threats by pointing to the Congresswoman's social media posts, his conduct extended far beyond threatening the Representative.

It extended to the Representative's spouse.

It extended to the Representative's children.

---

[2]    https://x.com/JustinGrayWSB/status/1354870334655262724/photo/1, last accessed May 4, 2026.

[3]    https://www.mediamatters.org/facebook/marjorie-taylor-greene-penned-conspiracy-theory-laser-beam-space-started-deadly-2018, last accessed May 4, 2026.

It extended to the Representative's staff.

It extended to the Representative's staff's families.

For example, on January 21, 2025, the Defendant ended his call by saying, "*We're going to kill you and your staff and staff's family.*" The Defendant's faulty rationalization that his repeated anonymous threats to kill the Congresswoman were somehow motivated by her years-old social media posts offers no explanation for why he threatened her family, her staff, and their families.

The Defendant's sentencing memorandum attempts to justify his actions to shield him from their consequences, but it is the role of the Court to assess his conduct, which was to terrorize and intimidate an elected Member of Congress with whom he disagreed politically. For a democratically elected Republic to function properly, there must be a strong consequence for this conduct.

II.    **The Need for the Sentence Imposed**

The Defendant's sentencing memorandum fails to address the Government's arguments as to the need for its recommended sentence. Indeed, the Defendant's attempts to justify and downplay his culpability for repeatedly making graphic death threats to a Member of Congress clearly demonstrate that he still fails to recognize the serious nature of the offense and has an inadequate respect for the law. Further, the Defendant does not even attempt to address how the Government's recommended sentence is necessary to afford adequate deterrence to criminal conduct in light of the explosion of threats and political violence against government officials generally and Members of Congress in particular. The United States Capitol Police reported that it investigated 14,938 concerning statements, behaviors, and communications against lawmakers,

their families, staff, and the Capitol complex in 2026, up from 9,474 in 2024 and just over 8,000 in 2023.[4]

A lenient sentence to the Defendant here will make clear to the thousands of individuals who communicate threats to Members of Congress each year that they may continue to act with impunity. Therefore, the Court should impose the Government's recommended sentence and deter further threats against Congress.

### III.    The Applicable Sentencing Guidelines

The Defendant's sentencing memorandum raises disputes about the applicability of U.S.S.G. § 3A1.2, which applies when "(1) the victim was (A) a government officer or employee; (B) a former government officer or employee; or (C) a member of the immediate family of a person described in subdivision (A) or (B); and (2) the offense of conviction was motivated by such status." As an initial matter, the Government notes that in the plea agreement the parties agreed that a six-level increase applied pursuant to U.S.S.G. § 3A1.2(b). *See* ECF No. 27 at 3-5 (explicitly stating that the parties agreed that the six-level increase of the Official Victim Adjustment pursuant to U.S.S.G. § 3A1.2 applied in the calculations of the Estimated Offense Level and that "the parties also agree that neither party will seek any offense-level calculation different from the Estimated Offense Level calculated above."). The Presentence Investigation Report (PSIR) also found that the six-level increase pursuant to U.S.S.G. § 3A1.2(b) applies in this case, and the Defendant did not object to that finding. *See* ECF 33 at ¶ 29.

In any case, there is no basis to dispute the six-level increase here. The Congresswoman was a "government officer or employee" at the time of the relevant conduct and is now "a former

---

[4]    https://www.cbsnews.com/news/threats-government-officials-prosecutions/, last accessed May 7, 2025.

government officer or employee." Each of the threatening calls was made by the Defendant to the official Congressional Offices of the Congresswoman. The Defendant references the Congresswoman's political rallies, political positions, the inauguration, and her Congressional staff. Thus, the Defendant's threats were clearly motivated by Congresswoman Greene's status as a government officer or employee. In addition, the repeated threats by the Defendant against the Congresswoman's family, staff, and staff's family, would all separately cause the Adjustment to apply. The Defendant makes no attempt to explain how threats against the Congresswoman's staff and staff's families could be motivated by anything other than their employment by the government.

Therefore, the Defendant's conduct falls squarely within U.S.S.G. § 3A1.2(b) and the six-level increase should be applied.

## IV.    The Need to Avoid Unwarranted Sentence Disparities

Finally, the Government notes that in the PSIR, the United States Probation Office provided Judiciary Sentencing Information for the last five fiscal years. According to that information, 94% of defendants with the same Final Offense Level and same Criminal History Category as the Defendant received a sentence of imprisonment. Of all of the defendants with the same Final Offense Level and same Criminal History Category as the Defendant, the average length of imprisonment imposed was 19 months and the median length of imprisonment was 21 months.

In light of the Defendant's egregious abuse of his access to taxpayer-funded resources to repeatedly make anonymous and terrifying threats to kill a sitting Congresswoman, her staff, and their families over the course of more than a year, the Government submits that a sentence higher than the average sentence according to the Judiciary Sentencing Information is warranted. The

Defendant's sentencing memorandum——an exercise in rationalization and avoidance of accountability—provides no justification for a below-average sentence.

## CONCLUSION

For all the foregoing reasons, as well as the reasons set forth in the Government's Memorandum in Aid of Sentencing, the Government respectfully submits that the statutory factors set forth in 18 U.S.C. § 3553(a) support the Government's requested sentenced of 30 months of imprisonment on Count Three, followed by 3 years of supervised release, and 24 months of imprisonment on Count Four, followed by 1 year of supervised release, with the sentences on the two counts run concurrently.

Respectfully submitted,

Jeanine Ferris Pirro
United States Attorney

By:    */s/ Brendan M. Horan*
Brendan M. Horan
Special Assistant United States Attorney
N.Y. Bar No. 5302294
Travis Wolf
Assistant United States Attorney
NY Bar No: 5483243
601 D Street NW
Washington, DC 20579
(202) 730-6871
Brendan.Horan@usdoj.gov